Good morning. Good morning, Your Honors. Gretchen Fuselier on behalf of the appellant Steve Lawrence Scott, if it please the court. Do you want to save any time for rebuttal? Yes, I planned to reserve five minutes for rebuttal. Okay, thank you. This court, this appeal actually arises out of Mr. Scott's trial where Judge Riall violated several of his rights to a fair trial. Beginning at the voir dire, he did not permit the defense counsel to probe the racial attitudes of the prospective jurors. And of course the standard of review is an abuse of discretion and it is an abuse of discretion when the when the court denies such a probe to a material matter. In this particular case, I don't think it's undeniable that race is underlying central core issue in this particular indictment against Mr. Scott. So the court did allow some of the questions, right? There were some questions about race. They just didn't ask the more specific ones? No, the courts did not allow any of the suggested voir dire. But the court asked some questions about race? The court asked one question and the question that he asked is would you would it be more frightening for you to be assaulted by someone of your of a different race or someone of the same race as you? That really does not hit on the racial attitudes. The emotion of fright cannot parallel with the type of information that would have been obtained by defense counsel. What she attempted to ask is, is there anyone here who would automatically convict the defendant of the charge regardless of the evidence simply because the government accused him of participating in racially motivated violence? So my notes it says the court also asked whether there was any juror who feels that the case has anything to do with race. The court asked those two questions but didn't ask the more specific questions that were proposed. That's correct. By defense counsel. The purpose of that question that was posed by the court was actually to eliminate any juror who felt it was. Were there any jurors that were excused that did answer questions? Yes. As I pointed out in my opening brief and in the reply brief, one juror did raise her hand and indicate she did. And the court sua sponte, excused her. This sets the tone, I believe, for the rest of the jurors to understand that Judge Rayall was not going to allow the element of racial attitudes to invade the trial. And when we look at the indictment that was filed against Mr. Scott in this case, there's nothing about that that was race neutral. Nor if we look at the opening argument of the government. The government in its opening argument actually indicated that you will hear about the AV taking revenge on a black who had hit a white person in the recreational yard. This case is a little bit different than, say, if you have a racial hate crime in terms of where someone just, you know, you have an goes out and kills someone in that. I mean, this case is, you know, while I agree with you that there are, that certainly gangs have a racial component in that, you know, the Aryan Brotherhood are white. You know, the D.C. blacks are going to be black. You know, the Mexican Mafia, the Nuestra Familia. I mean, they tend to break down by racial lines. But it's, there's a bigger issue going on here in terms of whether the criminal enterprise, how these gangs work. You know, it's for drugs. It's to control the prisons. It's to control behavior of the individuals that are in the gang. Any number of things. So it isn't your typical, it's not a typical hate crime regarding race. But certainly there are racial components. I agree with you. So then the issue becomes where a court has fairly broad discretion. And I, you know, and I think that we're going to talk about other things here. There's a lot of things here that I probably would not do like the judge in this particular case. I'm not, you know, I'm not going to say that this is a model of how you handle a trial. But a court does have wide discretion in terms of what questions can be asked on voir dire and covering those Your Honor, I understand the element of discretion. However, this circuit as indicated in the case that we cited, Aldridge v. United States, which is a U.S. Supreme Court case, indicates that specific questions relating to, in this case, racial attitudes are necessary when there is, well, that case points down to three instances that supports specific voir dire questions. And one of which is when a case carries racial overtones. Well, I think as you just indicated, it's undeniable that this case, in fact, carries those racial overtones. And consistent with that case, the, and consistent with the testimony that was elicited by the government from its witnesses relating to racial, it seems, animus because of the race-based A-B's philosophy. I don't think that it can be said that Judge Rial did not abuse his discretion by failing to elicit more meaningful information regarding racial attitudes. And as we pointed out in our brief, there's a And that is because when there are issues that Well, I think we have your argument in mind. I think you briefed it well. And since we have a limited amount of time, I would like to talk about some other allegations that you make in here. And first I want to ask, did Scott raise the issue of judicial misconduct before the district court? Yes, Your Honor. His attorney actually repeatedly indicated to Judge Rial that there was a violation of his Sixth Amendment rights, rights that were being perpetrated by the court, that his due process rights were being violated. And Judge Rial actually Well, essentially saying you're cutting me off on cross-examination, you know, you're And by not allowing me to pursue To pursue. Well, I guess what I'm asking here is, is this reviewed for Judge Rial, some of the things that he did were error. Do we review it for harmless error? I believe that is I mean, do we have to determine whether he was I don't, I believe that if you find that there was prejudice, according to the argument Well, but that's a harmless error in the law, I say It seemed as though the standard of care was if the, if the conduct established, or risked the prejudice to the trial. And I'm not sure that you need to review or find clear error, and I don't think that you need to find harmless error. Well, but wait, otherwise what you're saying is that the misconduct is structural error. If you don't do a harmless error analysis, it's got to be structural error. And so I, I don't find a case that stands for that proposition. So I'm laboring under whether it be a misconception or not, and I'm asking you to disavow me of that. I think that if we find that some of his conduct was error, or that he shouldn't have behaved that way, he The prosecutor wasn't totally unscathed in some of the things, but the defense attorney, some of which might have been appropriate, where the court's saying, well, how's that relevant, or things along those lines. But there, there does seem to be some disparaging in front of the jury of the defense attorney. But I think we have to do a harmless error analysis, and counsel here seemed to get a pretty good result. The jury didn't convict Mr. Scott of everything, and it seems to be a pretty strong case. So I'm wondering, how does that fit together? Well, Mr. Scott went to trial on only one count, and that was count two, the, the Rico conspiracy. And associated with the verdict, there was a special verdict as far as the jury's findings relating to the two or more predicate offenses that he agreed to. And although he, they did not find that he was involved in the stabbing of Benitez Mendez, they did find that he was involved in planning murders against D.C. Well, but that Benitez Mendez case, to me it sort of looks like the jury might have been doing their job from the standpoint, because wasn't that the case where the government threw away some evidence? There was some bloody clothes that the government, not, not this government per se, but the investigating, the, the people decided that he didn't have anything to do, that, you know, they threw away some bloody clothes. Well, the bloody clothes, according to the testimony, were found in the cell of, I believe, a Mexican-American, I forget his name at the time. One of the guards who responded to the call for assistance when he showed up, his testimony was that the person who he saw with the knife running behind the victim was African-American. So the test, the evidence actually pointed against or away from him. Well, but they looked at the evidence. It's like, guess what I'm saying. What about Bond, that predicate act? What did they find on that? They did find that he was involved in the, well, no. I thought they didn't find Bond. They did not find him. And he's already convicted of that, right? No, not. On Bond, wasn't he already convicted of that? In a previous trial? Yeah. I think, isn't that part of the reason he's in prison? Your Honor, I would have to check the record. I don't recall that he was. I'm thinking on that, well, I can ask the government, but I'm thinking on that, there was actually a witness to that stabbing. Isn't that the guy who stabbed him in the shower? That's correct, Your Honor. All right. That's correct. I think he was already convicted on that, but I think that the jury said it wasn't one of the predicate acts here. They might have just thought he stabbed him for some other reason. So. We don't know. Well, we don't know, but what I'm saying is, if you're doing an analysis for harmless error, they didn't just buy everything hook, line, and sinker. They seem to still, you know, I can see some sort of logical reasons of how they're going through this and why they may have come to some conclusions. And so, you know, unless you do a structural error analysis and you say that Judge Real picking on the defense counsel, if you find that he was picking on the defense counsel, that therefore that's so pervasive and therefore without, you know, looking at the rest of the case and the strength of the case and how it affected the outcome, that's what I think you have to do that before you say that you win from his conduct. Your Honor, in addressing the standard of review relating to the demeaning conduct that Judge Real took against the defense counsel at trial, according to the case of United States versus Mostella that we cited, it indicates that a reviewing court, if the record discloses actual bias on the part of the trial judge, relieves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality. And are you arguing that there was actual bias here, that the comments by Judge Real met that standard? It certainly, yes. That is our argument, and it certainly is borne out by the record below. The comments that were reviling, actually, almost as though he had a personal vendetta against trial counsel, included a remark as, wipe the smirk off your face or don't smirk like that. So he made that comment about the smirk, and then he had a couple of comments saying, you know better than that. Well, he made the comment of, you know, give the jury some credit for being able to think, for having a brain. We're not wasting the jury's time. Make your proffer in writing. And yet, when the defense counsel asked for certain witnesses to not be dismissed so she could make written proffer, he rejected that request, indicating, I'm not wasting the court's time, I'm not wasting the jury's time. There was a litany of this type of attitude that was directed only against defense counsel. So in the actual bias cases, you'll have cases where there was a financial interest or where the judge had been sued by the defendant. So it's fairly extreme. So what do you think is the case that's closest to this sort of intemperate and one-sided remarks? The case that I cited is United States versus Hall and Sumeru. And although it was an unreported, unpublished opinion, I did cite that federal rule of appellate procedure, Rule 32.1a and b, allows for the In that case, this court indicated the court, Judge Rayall, who is the same judge as the judge who oversaw the trial of Mr. Scott, persistently interrupted appellant's presentation of their evidence sua sponte. That's what happened in Mr. Scott's case. Interposing adverse evidentiary rulings with such frequency that the government was effectively relieved of its responsibility to make objections. That's essentially what happened in Mr. Scott's case. It's rare to find in the record an objection that was made by the government. The objections were seemingly all sua sponte made by Judge Rayall. By contrast, this court goes on to say, the court allowed the government to examine witnesses and move exhibits into evidence without the same degree of scrutiny and intervention. The court overruled most defense objections without explanation and admitted evidence offered by the government that it had previously excluded when offered by the defense. The court made several intemperate remarks to defense counsel while in the jury's presence. Here, the court indicates that the Ninth Circuit indicates that the District Court Judge Rayall made only several intemperate remarks. Now, the interpretation of several can be either limited or more expansive, but reviewing the record and the incidences that I have itemized in the case is certainly more pervasive than just several. The court also terminated Sumeru's cross-examination of a prosecution witness without a valid reason and refused to permit Hall to cross-examine the witness. You're not going to have much time for rebuttal if you want to save time for rebuttal. Well, Your Honor, I think that between my opening brief and the reply brief, this issue, our argument is completely and adequately presented in case, unless the court has more questions regarding that case. I would like to say something about the note-taking argument that we made. Judge Rayall prevented and prohibited the jury from taking any kinds of notes, and although... Well, there is a, there is, there's, there's, there's kind of a split on this. You know, I let people take notes, but some judges think if people take notes, they're not looking at witnesses' faces, they're not really listening, they're distracting, and so tell me what case says that a judge doesn't have the authority to say you can't take notes. Well, I cited it in my brief at, let's see, well, I cited it in my brief. I would have, I hate to take the time to, but essentially the case indicated that when, when the court's policy is inflexible and does not consider the unique circumstances of particular cases, that would be an abuse of discretion. In this particular case, there were a hundred and some exhibits that were, that were admitted into evidence. There were seven A.B. and former A.B. members who testified. There were witnesses who testified who were guards at the, at various prisons, and there were many co-conspiratorial, co-conspiratorial statements that were admitted. But it was only a seven-day trial, right? So it wasn't like a five-month trial. It was a seven-day trial, but that's a lot of evidence to absorb. It's also reported, and you can ask for readbacks, too. They asked for readbacks, and the court rejected the readback. They had some readback, right? And not until the day after the jury asked for a readback did the defense counsel see the jury note requesting it with Judge Rayall's note saying, not available. And I did put that jury note in our excerpts of record. At that point, when the defense attorney confronted Judge Rayall, he did indicate, well, we'll, we'll read back one, but not the other. And so they did not get the requested readback completely. Thank you. Good morning, Your Honor. My name is Ann Voights, and I represent the government in this case. Good morning. I'd like you to go right to, I don't think that, I'd like you to go right to, if we find that there was some misconduct, if we find that the judge should have, you know, did make disparaging comments, what's the framework for analysis? Do we do the harmless error analysis? And if we do the harmless error analysis, I didn't find, you know, then I need to know what the strength of your case is. I didn't find that, I didn't find that particularly well articulated in your brief. Certainly, Your Honor. First, if I can respond to the, whether a harmless error applies or not. If the court looks at some of the cases that were discussed in the brief. I mean, he has been discussed in other cases, so this isn't, doesn't seem to be an unusual situation. Yes. And when you look at the cases they've consistently looked at, they've used terms like, has it cured the harm, for example, did the court give curative instructions about how the jury should, as it in fact did here, about how the jury should take comments to counsel. And here, in fact, the district court specifically told the jury, both before evidence came in and at the close, that they were not to take any inference from anything that he said to counsel or his rulings on evidentiary matters. Well, of the, do you think that some of the comments were over the line? I think certainly the court was difficult with defense counsel, but as you pointed out, there were also certain comments directed towards the government. The court was clearly concerned with what it viewed as testimony going on too long or going too far afield of what it viewed as the central allegations in the case. And if I might address the issue of the strength of the government's case in terms of the harmless error, this is a case where I think it's clear that the evidence was overwhelming. If you look simply at the exhibits that were in defendant's own handwriting, exhibits two through six, they included defendant's statement that the AB was at an on-site war with the D.C. Toads. Exhibit three, he was instructing other AB members on how to make weapons and where to hide them. Exhibit four, he was talking about smuggling weapons. Exhibit five, he was talking about how to communicate with other AB members. And in exhibit six, this was a party list, the hit list, where all of the people on the list were members of the D.C. Blacks. They were all black. They were all individuals that the BOP knew that the AB had issues with. This was found in defendant's cell. It was also, as a number of witnesses point out, something that defendants gave out to other AB members. Well, what was he convicted of? He was convicted of running racketeering, and the two racketeering acts that the jury found him guilty of were the murder of Walter Butch Prince Johnson, who had attacked an older, or the conspiracy to murder Walter Butch Prince Johnson, and a conspiracy to murder two D.C. Black inmates, excluding Irving Bond and Johnson. Now, Irving Bond, was he already convicted of trying to kill Irving in the shower? Yes, he'd been convicted of assault with intent to commit great bodily harm in a prior case. All right, and there was a witness to that, too, right? Yes. Like a guard or something? Yes, in fact, at the trial, there were a number of witnesses who spoke about it. There were guards who witnessed it. And in addition, there was also, I believe, Mr. Couples also spoke to that. Well, so that seemed to be pretty strong, that he, in fact, did that. But obviously, the jury didn't think that it had anything to do with the conspiracy, right? I mean, or if we can infer anything from that. It would appear, given the evidence the defendant actually committed the act, that where there was a disagreement was whether this was in furtherance of the conspiracy. So they didn't find all of the predicate acts. They did convict him of the count that he was charged with. But they did seem to engage in some discrimination in how they approached their job. Very much so, Your Honor. In fact, they did not find him responsible for two acts involving drug trafficking. And similarly, they did not find him responsible for conspiring to murder Ismael Benitez-Mendez, Timothy Inman, Frank Ruopoly, Irving Bond, or Walter McKeon Johnson. So I think when one looks at the question of whether this sort of gives an abiding impression of partiality or advocacy, the fact that the jury clearly wasn't sort of overwhelmed. They were able to look at the evidence. And they made certain distinctions about the acts that they thought defendant was responsible for, and the acts that they thought that he was not. So we would submit that any error, if there was, or any statements that perhaps came close to the line did not amount to harmless error in light of the court's instruction and the overwhelming evidence that was in the record against defendant. I'm sorry, you had a question, Judge. What about the not, I mean, the court was pretty tight on asking questions about race. And I mean, these wars do seem to be between people of different races, and they're prison gangs, and all of that. I think if I could first address the district court's statements about race, this not being a race case. I think that was the court, perhaps not totally artfully, trying to explain that this wasn't, as this court pointed out, a hate crime. The issue here was a racketeering charge. And while there certainly were admittedly racial overtones, this was not a case where defendant's guilt turned on his views towards any particular race, or his views about racial supremacy. And so I think the court certainly did allow, I believe we set forth in our brief in some detail, the court certainly did allow some inquiry into issues of race. But it did curtail defense counsel when, in its opinion, she went too far afield. And we would submit that that was not an abuse of discretion under these circumstances. In fact, if the court takes a look at the record, I would submit that, on the whole, defense was able to explore on cross-examination a number of very important issues, and certainly was able to establish points that the jury clearly considered in reaching its determination. Though there was some testimony on the prison being racially divided, or that the gangs were divided on racial lines, the judge cut off any testimony that would further explore racial tensions in the prisons. In fact, the court actually did ask one question about that. They asked whether the racial tensions were by reason of race, territory, or power. And one of the witnesses responded, all of the above. So there was inquiry into the fact that there, and there was testimony about the racial divisions. There's also testimony in the record about the fact that one could be in the A.B. and have friends who are of other races. But that if the A.B. told you that you were at war and you had to kill them, you would have to follow those orders. Well, what do we do about the judge's comments that opposing counsel suggests, or actual, show actual bias? That the comments suggesting that the defense counsel is acting in bad faith, and thinks the jury is not intelligent, or that he directs her not to smirk. What do we do about that? Do those show actual bias so that there's a need to do a new trial regardless of the prejudice? The defense did not articulate this as an actual bias claim in their briefs. And that this is not a case that I think rises to the standard of actual bias. I think this is more properly analyzed under whether this gave an appearance of partiality or advocacy. The court certainly did reprimand defense counsel on occasion. But I would submit that if the court looks through the transcript. Well, the court did, like, make, you know, his own objections all the time. And it's sort of like, I remember, you know, Your Honor, if you're going to try your case, can you at least not lose it for me? You know, that's the, I mean, it's like the prosecutors. You know, a lot of times people want to, parties want to get hearsay evidence in. And hearsay evidence is only hearsay if someone objects. Otherwise, it comes in and it's for the truth of the matter. So, you know, I mean, the court was certainly aggressive about managing this case and what he wanted to hear. I think he certainly was. But if you look at the record, I think the court will see that while occasionally he would reprimand counsel or he'd instruct her not to, he'd sustain, or he would instruct her not to ask a particular question. She could often come back around to the issue and ask a similar question. Did counsel ever complain he was committing judicial misconduct? Or did she deal with each objection individually? She did, at certain points, claim that he was violating her client's constitutional rights. Okay, but that, but the right to confrontation, right? Yes. Or you're saying you're interfering with my case or what? I believe she specifically cited the confrontation clause at one point. And other points, it may simply have been that the court wasn't allowing her to try her case. Okay. I do not recall that in the record there was any claim of active violence. That you're picking on me. It's, I mean, that you could infer it from that. It can be inferred from defendant's objections. If I might turn to the issue of voir dire for one moment. I'd like to point out simply that the issue of race was fronted. It may not have been with the precise questions that defense counsel proposed. But it was raised both in the jury questionnaire with the issue about whether one would find it more frightening to be attacked by someone of a different race. But it also came through in the indictment, which was read as part of the voir dire process. It was read to the veneer. And both the government and defense made their opening statements. And after that, and the indictment itself mentioned a race where they were asked whether anything they'd heard in those opening statements or in that indictment meant that they couldn't judge the case fairly. Given that, given the court's question about racism and given the jury questionnaire. So how many people said they couldn't and how many people were excused? What was, what does the record show on that? The record shows that there were a significant number. I don't have the precise number, but there were a large number of jurors who said, I cannot be unbiased in this case. And the court excused them. And that would have been after the one question that he said, reading of the indictment and hearing opening statements? Yes. And after the jury questionnaire. Okay. So it's meant that because the district court does have broad discretion, it did address the issue that was required to do. And it was not required to ask the specific questions that defense counsel submitted. What it did do was sufficient. If the court has no further questions. We have no additional questions. Thank you. Thank you very much. Within my last one minute. Well, let me just, let me phrase it from this standpoint. Obviously the jurors got to hear, you know, a lot of times jurors don't even get to hear opening statements before they're vaudeered or anything. So they hear what the attorneys are going to talk about in the case. They hear what the indictment is. And then they hear the question that Judge Reel did decide. So they know what the case is going to be about. And several of them say that they can't be fair. Why isn't that enough? It's not your first choice, but why isn't that enough? We don't think it's enough because there, they were, first of all, the purpose of vaudeer is so that defense counsel can use peremptory challenges and challenges for cause without a more in-depth evaluation of each particular juror. As the cases that I cited point out that, that critical point of the trial is destroyed or at least damaged because you're not getting the jury that you otherwise might get. So to thwart the critical aspect of jury selection based on racial attitudes, when in fact, as you indicate, it has, it's, it's out of the box was obviously in our opinion and based on the arguments that we've made in the cases cited an abuse of discretion. All right. Your time's up. Thank you. Thank you both for your argument. This matter will stand submitted.
judges: Rymer, Callahan, Ikuta